336 F.3d 279
 UNITED STATES of America, Plaintiff-Appellant,
v.
Zacarias MOUSSAOUI, Defendant-Appellee,
ABC, Incorporated; Associated Press; Cable News Network, LP, LLLP; CBS Broadcasting, Incorporated; the Hearst Corporation; National Broadcasting Company, Incorporated; the New York Times Company; the Reporters Committee For Freedom of the Press; the Star Tribune Company; Tribune Company; the Washington Post, Intervenors.
 No. 03-4162.
 United States Court of Appeals, Fourth Circuit.
 Filed: July 14, 2003.
 ORDER
 
 1
 Appellant filed a petition for rehearing and rehearing en banc.
 
 
 2
 Chief Judge Wilkins and Judges Williams and Gregory voted to deny a panel rehearing.
 
 
 3
 A member of the Court requested a poll on the petition for rehearing en banc. A majority of the judges in active service voted to deny rehearing en banc. Judges Wilkinson, Widener, Niemeyer, Luttig, and Shedd voted to grant rehearing en banc. Chief Judge Wilkins and Judges Williams, Michael, Motz, Traxler, King, and Gregory voted to deny rehearing en banc.
 
 
 4
 The Court denies the petition for rehearing and rehearing en banc.
 
 
 5
 Chief Judge Wilkins wrote an opinion concurring in the denial of rehearing en banc, in which Judges Williams, Motz, King, and Gregory joined. Judge Widener wrote a dissenting opinion. Judge Wilkinson wrote a dissenting opinion, in which Judge Niemeyer joined. Judge Luttig wrote a dissenting opinion.
 
 
 6
 Entered at the direction of Chief Judge Wilkins for the Court.
 
 
 7
 WILKINS, Chief Judge, concurring in the denial of rehearing en banc:
 
 
 8
 My colleagues have written at length regarding their views on the issue of jurisdiction under the Classified Information Procedures Act (CIPA), 18 U.S.C.A.App. 3 (West 2000 & Supp.2003). For the reasons set forth in the panel opinion and emphasized below, their views are incorrect. Ultimately, I believe my colleagues have allowed the importance of the issues involved in the underlying merits of this appeal to cloud their judgment on the purely legal question of jurisdiction. While the underlying merits present issues of great importance, what is now before us is an ordinary question concerning appellate jurisdiction over a discovery order. Even the gravest concerns of national security cannot, consistent with the limitations imposed on us by the Constitution, afford jurisdiction where none otherwise exists.
 
 I.
 
 9
 My colleagues, and the Government in its petition for rehearing, incorrectly suggest that the panel opinion concludes that CIPA does not apply to disclosures of classified information to the defendant. The panel reached no such conclusion, however. Indeed, there is no question that CIPA § 7 authorizes the government to take an interlocutory appeal from an order of the district court that authorizes the disclosure of classified information to the defendant. See United States v. Clegg, 740 F.2d 16, 18 (9th Cir.1984) ("It is clear that CIPA is as concerned with controlling disclosures to the defendant as it is with controlling disclosures to the public.").[1] Further, there is no question that most or all of what the enemy combatant witness says during a deposition will be deemed classified by the government and that such information will be "disclosed" to Moussaoui during the course of the deposition. These facts, however, are not alone sufficient to create jurisdiction under CIPA § 7.
 
 
 10
 CIPA § 7 creates an exception to the general prohibition on interlocutory appeals and therefore must be narrowly construed. See United States v. Quintana-Aguayo, 235 F.3d 682, 686 (1st Cir.2000) (per curiam); accord Allen v. Okam Holdings, Inc., 116 F.3d 153, 154 (5th Cir.1997) (per curiam); Shimer v. Fugazy (In re Fugazy Express, Inc.), 982 F.2d 769, 777 (2d Cir.1992); South Bend Consumers Club, Inc. v. United Consumers Club, Inc., 742 F.2d 392, 393 (7th Cir.1984); Blake v. Zant, 737 F.2d 925, 928 (11th Cir.1984); Florida v. United States, 285 F.2d 596, 600 (8th Cir.1960). Even assuming that the construction of § 7 advanced by my colleagues — i.e., reading the pertinent provision broadly so as to authorize an interlocutory appeal from any order authorizing the disclosure of classified information — is a reasonable one, it is no less reasonable to construe § 7 more narrowly as authorizing interlocutory appeal only of orders entered pursuant to the provisions of CIPA, of which § 7 is part. We must therefore determine whether the district court issued such an order, i.e., whether the order of the court was governed by one of the provisions of CIPA. The answer to that question clearly is "no."
 
 
 11
 Two provisions of CIPA are potentially applicable here. The first, § 4, allows the Government to redact certain information from "documents to be made available to the defendant through discovery." 18 U.S.C.A.App. 3 § 4. Even if the word "document" refers broadly to any written or recorded material that may be subject to redaction before being provided to the defendant, § 4 does not apply because live deposition testimony, by its nature, cannot be redacted in advance of being disclosed to the defendant.
 
 
 12
 The other potentially applicable provision is § 6, which is the provision the district court applied by analogy in making its ruling. By its terms, § 6 sets forth procedures governing the use of classified information at trial or in pretrial proceedings. See id. § 6(a). Unlike § 4, § 6 does not concern pretrial discovery of classified information. As explained in more detail in the panel opinion, no issue regarding the admission of the deposition testimony at trial is yet presented, because it is not known what the witness might say during the deposition, if he agrees to speak at all.[2]
 
 II.
 
 13
 The panel also determined that this court lacked jurisdiction under the collateral order doctrine. See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). This conclusion is disputed by one of my colleagues, who argues that two other circuits have held that a party need not defy a discovery order and be sanctioned in order to bring an interlocutory appeal. The law of this circuit imposes such a requirement, however, and we are bound to follow it. See MDK, Inc. v. Mike's Train House, Inc., 27 F.3d 116, 121-22 (4th Cir.1994). Additionally, the authorities my colleague cites are distinguishable. In United States v. Philip Morris Inc., 314 F.3d 612, 619-20 (D.C.Cir.2003), the District of Columbia Circuit declined to impose the disobedience-and-sanction requirement on a criminal defendant because it was not clear that a contempt order would be appealable in that circuit. And, the Third Circuit in Kelly v. Ford Motor Co. (In re Ford Motor Co.), 110 F.3d 954 (3d Cir.1997), did not even mention — much less consider and reject — the disobedience-and-sanction requirement.
 
 III.
 
 14
 Finally, I must address my colleague's claim that the panel decision impairs national security. According to my colleague, "any decision in a litigation of this sensitivity inescapably" has a "profound effect ... upon the delicate psychological balance that can determine victory or defeat as much as can combat itself." Post, at 35. Thus, my colleague implies, we must exercise jurisdiction here so that we do not tip the "psychological balance" in favor of the nation's enemies.
 
 
 15
 Indeed, according to my colleague, the order of the district court and our determination that the order is presently unreviewable have already affected the manner in which the executive branch is exercising its national security function. My colleague's allegations find no support whatsoever in the record. Such speculation can only serve to needlessly alarm the public and appears, regrettably, to be an attempt to divert attention from the legal principles that control our decision.
 
 
 16
 My colleague apparently would have us simply rule in favor of the government in all cases like this one. From his limited review of the petition for rehearing and suggestion for rehearing en banc, the accuracy of which he assumes, he believes — because the Government asserts national security interests and because he speculates about national security interests the Government does not assert — that it is our duty to exercise jurisdiction without waiting to determine whether any sanction that might be imposed would be acceptable to the Government. Siding with the Government in all cases where national security concerns are asserted would entail surrender of the independence of the judicial branch and abandonment of our sworn commitment to uphold the rule of law.
 
 
 17
 There is a better way, which is indeed the only correct way. We can, as we have done here, apply settled principles governing the appealability of discovery orders in a consistent manner. This will allow the executive branch to anticipate the likely resolution of legal issues, which will in turn ensure that the executive branch retains the burden and the authority to decide how best to protect national security. Because the panel has followed this path, a majority of the members of this court has correctly decided to deny rehearing en banc.
 
 
 18
 Judges Williams, Motz, King, and Gregory concur in this opinion.
 
 
 
 Notes:
 
 
 [1]
 Although my colleagues maintain otherwise,Clegg is not contrary to the panel's decision. At issue in Clegg were proposed redactions of documentary material and a resulting district court order under CIPA § 4. As explained infra, a live deposition cannot be redacted prior to disclosure to the defendant and hence is not subject to an order under § 4.
 
 
 [2]
 One of my colleagues acknowledges that the district court has not yet ruled on the admissibility at trial of the witness' testimonySee post, at 284. He would nevertheless conclude that the order of the district court was entered pursuant to § 6 because, in deciding to grant access, the district court considered questions similar to those it will confront when and if Moussaoui seeks to enter portions of the deposition into evidence at trial. I simply cannot agree that similarity of the questions involved is sufficient to transform an order not governed by CIPA into one appealable under § 7. See Florida, 285 F.2d at 600 ("Changes in appeal jurisdiction should be made by appropriate legislation, not by judicial modification."). Moreover, unlike my colleague, I am unwilling to assume the substance of a ruling the district court has not yet made, based on the content of testimony Moussaoui has not yet sought to enter into evidence, in the context of a trial that has not yet taken place.
 
 
 WIDENER, Circuit Judge, dissenting:
 
 19
 I respectfully dissent from the denial of the motion to recall the mandate in this case and to grant rehearing by the en banc court. I agree largely with the dissenting opinions of Judge Wilkinson and Judge Luttig, but I would add a word.
 
 
 20
 Both the defendant, Moussaoui, and the witness are acknowledged members of al Qaeda, the worldwide network responsible for the catastrophe of September 11, 2001 in New York. Indeed, the acknowledged membership of both in that organization is the only rational reason the district court is bound to have considered as it required the testimony of the foreign witness for Moussaoui: the witness knows enough about the al Qaeda organization to be able to testify with perhaps facial credibility that Moussaoui had nothing to do with the September 11 events in New York. Therefore, the testimony of this witness would tend to show that Moussaoui is not guilty of the offenses charged. That is to say, although Moussaoui is admittedly a member of the al Qaeda conspiracy, he had nothing to do with the September 11 events in New York. Assuming, as we must, that the facts I have just related are true, in my opinion it is idle to speculate that the testimony of the foreign witness to be given in his deposition ordered by the district court would not reveal an enormity of classified information. Accordingly, Section 7 of the Classified Information Procedure Act provides that the orders of the district court in question be subject to appeal. I would hear that appeal forthwith.
 
 
 21
 Anything I have said herein must not be taken as my opinion that the orders of the district court requiring the deposition of the foreign witness, and that the government state its compliance or non-compliance, by today, are free from error.
 
 
 22
 WILKINSON, Circuit Judge, dissenting from the denial of the motion for reconsideration:
 
 
 23
 I appreciate the good efforts made by the members of the panel to resolve this case. Because I believe, however, that the appeal from the district court's order must be entertained, not dismissed, I respectfully dissent. In my view, the dismissal of this appeal impairs the Executive's ability to manage classified information in accordance with the clear mandate of the Congress. The dismissal has erected serious hurdles to the review of the most sensitive national security questions — precisely the result that CIPA was enacted to prevent.
 
 
 24
 The defendant is an alleged terrorist and co-conspirator in the September 11th atrocity. He seeks to force the government to produce an enemy combatant detained overseas — a fellow member of the al Qaeda network — for a deposition that would aid his defense. This witness possesses sensitive information relating to the planning and commission of the September 11th attacks. Undeniably, the defendant wishes to interview the witness to uncover this information. The district court balanced the relevant concerns for national security and individual rights under the framework provided by the Classified Information Procedures Act (CIPA), 18 U.S.C. app. 3 §§ 1-16 (2000), and ordered the government to produce the witness. Because that order unquestionably falls within the purview of § 7 of CIPA, I believe an appeal must lie.
 
 I.
 
 25
 As a matter of simple statutory interpretation, it is clear that an appeal is available in this case. Section 7 of CIPA enables the government to take an interlocutory appeal from "a decision or order of a district court in a criminal case authorizing the disclosure of classified information." The Executive branch has determined under § 1(a) of CIPA that anything the enemy combatant witness says in the circumstances of a court-ordered deposition is "classified information." See 18 U.S.C. app. 3 § 1(a). As the district court's order would force the disclosure of that information, it clearly "authoriz[es] the disclosure of classified information."[1] 18 U.S.C. app. 3 § 7.
 
 
 26
 It would, in fact, be difficult to find a clearer case of an appealable order under CIPA. An alleged co-conspirator in the September 11th attacks is attempting to elicit testimony from a fellow member of the al Qaeda terrorist network. The purpose of the interview is to discover sensitive information about the September 11th attacks. Much of the information at stake is exactly what the government has discovered through repeated interrogations of the detained enemy combatant. This is not even a close case in this regard: allowing the defendant to interview the source of such sensitive information will most definitely lead to the disclosure of "classified information." The statute speaks in plain terms, requiring appellate review of a district court order to disclose classified information, and that is just what is involved here.
 
 II.
 
 27
 My friends on the panel, however, do not agree with this straightforward interpretation of § 7. They assert that CIPA does not directly apply to this case and, consequently, that § 7 does not provide the right of interlocutory appeal. Specifically, they claim that § 7 does not provide a right of appeal independent of CIPA's other provisions; instead, they interpret § 7 to allow the government to appeal only from orders that are entered pursuant to other sections of CIPA, such as § 4 or § 6. Here, the panel concluded, the district court did not rely on either of these sections, since it did not order the disclosure of classified information but merely "granted access" to the witness. United States v. Moussaoui, 333 F.3d 509, 513-14 (4th Cir.2003). Accordingly, the panel reads § 7 not to allow an appeal from the district court's order.
 
 
 28
 This argument both ignores the words of the statute and draws a tenuous distinction between "grant[ing] access" to the source of classified information and "disclos[ing]" classified information. Moussaoui, 333 F.3d at 513-14. Nowhere does the statute indicate that only those orders entered pursuant to § 6 or other sections of CIPA are subject to interlocutory appeal under § 7. A plain reading of § 7 clearly establishes that its application hinges entirely on whether the district court issues an order "authorizing the disclosure of classified information, imposing sanctions for nondisclosure of classified information, or refusing a protective order sought by the United States to prevent the disclosure of classified information." 18 U.S.C. app. 3 § 7. Congress did not make the formal basis for that order any part of the § 7 inquiry.
 
 
 29
 Indeed, the lack of any reference in § 7 to other parts of CIPA, and specifically to § 4 or § 6, should conclusively establish this point. Congress has regularly included such internal references in statutes which grant a limited right of appeal. See, e.g., 12 U.S.C. § 3105(f)(1)(B) ("an order under subsection (e) of this section or section 3107(b) of this title" may be appealed to the courts of appeals); 29 U.S.C. § 210(a) ("an order of the Secretary issued under section 208 of this title" may be appealed to the courts of appeals); 33 U.S.C. § 520 ("[a]ny order made or issued under section 516 of this title" may be appealed to the courts of appeals). There is no such limiting reference in the text of § 7. Yet the panel itself has now supplied the limiting reference, unnecessarily circumscribing the reach of CIPA.
 
 
 30
 Even under the panel's erroneous interpretation, however, it must still explain why the district court's order here is not a CIPA order, in spite of the fact that the court expressly used CIPA's balancing framework. The panel attempts to do so (as the district court apparently did) by characterizing the order as one that merely "grant[s] access to the enemy combatant witness," not one that "authoriz[es] the disclosure of classified information." Moussaoui, 333 F.3d at 513-14. Thus, the panel suggests that the district court employed CIPA's balancing framework merely by analogy.
 
 
 31
 This distinction between "access" and "disclosure" lacks even a hint of foundation in the text of the statute. The district court order permits one alleged terrorist to question another. The defendant seeks to interview the witness precisely to elicit the most sensitive information, which the witness clearly possesses. Given the witness's role as a source of classified information, it is difficult to understand how "grant[ing] access to the enemy combatant witness" is not tantamount to the "disclosure of classified information." Id. And any attempt to distinguish between the right to depose the witness and the ability to admit that testimony at trial does not help the panel here. The district court has already ruled that this witness's testimony would be material and relevant to the defense, and that the defendant's interest in a fair trial outweighs national security concerns. Although this may not constitute a final ruling on the admissibility of what the deposition will uncover, this ruling made the exact determination that the district court will have to make for the admissibility of evidence at trial. Thus, the district court's order should have been made pursuant to CIPA, and even under the panel's interpretation, § 7 should provide the basis for appeal.
 
 III.
 
 32
 The panel further disregards the manifest purpose of CIPA, which carries special significance in this case because of the serious national security concerns at stake. Congress enacted CIPA to combat the problem of "graymail," which refers to efforts by defendants to derail prosecutions by seeking the disclosure of classified information. See Moussaoui, 333 F.3d at 513-14. For someone in the defendant's position — an alleged co-conspirator in the most deadly domestic attack in recent American history — the ability to call upon other deeply involved al Qaeda members is an effective weapon to force the government into an untenable prosecutorial position. The net result of the panel's decision is that the government now faces a Hobson's choice of either revealing classified information or facing sanctions, which could include dismissal of the indictment. This precise dilemma — "disclose or dismiss" — was just what Congress sought to eradicate by enacting CIPA.
 
 
 33
 But these errors do not merely impact the government's prosecution of this defendant, serious though that may be. The effect of this decision will resonate further, jeopardizing prosecution of other international terrorism or espionage cases. The panel opinion virtually requires government defiance of judicial directives: Executive officials now will be forced to disregard court orders in order to set up appellate review. This creates a most unhealthy relationship between the Executive branch and the courts, and it is exactly what Congress sought to avoid by providing for interlocutory appeals in § 7. Cf. United States v. Nixon, 418 U.S. 683, 691-92, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("To require a President of the United States to place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism for review of the ruling would be unseemly, and would present an unnecessary occasion for constitutional confrontation between two branches of the Government.").
 
 
 34
 The whole point of § 7, in fact, is to permit the government to make an informed decision after appellate review about whether to divulge confidential information or instead to risk sanctions by refusing disclosure. The panel's decision now pushes the government into making this draconian choice earlier in the litigation, before it can receive the benefit of Congress's protections in CIPA. And it also means that a single judge must resolve the confidentiality of sensitive information relating to vital matters of national security — here, the September 11th attacks — even though Congress clearly desired broader input through appellate review. Congress weighed national security concerns against the admitted inefficiencies of interlocutory appeals, and it struck the balance on the side of national security. We must honor that judgment, not because of a fidelity to the abstract notion of "national security" but because it is Congress' express mandate. By dismissing this appeal, the panel has inappropriately recalibrated the legislative balance and deprived the United States of a critical procedural device.
 
 IV.
 
 35
 We must not, in resolving this jurisdictional question, turn a blind eye to reality. The courts have placed one suspected al Qaeda operative in touch with another, and then denied to the United States the right to promptly appeal that decision. And all this is done in the name of a statute designed to provide some measure of protection to classified material. An appellate court might, to be sure, reach the merits of this appeal somewhere down the road, but the delays and disobedience now necessary to achieve appellate review will not reflect well on what remains fundamentally the finest system of justice in the world. I would grant the motion for reconsideration, grant en banc review, and consider the defendant's compulsory process claim forthwith.
 
 
 36
 Judge Niemeyer joins me in this opinion.
 
 
 
 Notes:
 
 
 [1]
 The fact that the disclosure may initially be to the defendant rather than to the public is irrelevant for purposes of § 7See United States v. Clegg, 740 F.2d 16, 18 (9th Cir.1984).
 
 
 
 37
 LUTTIG, Circuit Judge, dissenting.
 
 
 38
 I would grant the request of the United States to recall the court's mandate, and I dissent from the court's denial of that request.
 
 
 39
 I would also grant the request of the United States to have this significant case heard by the full court and I would hold that an immediate appeal lies from the district court's order of deposition. I believe that such is required under both the Classified Information Procedures Act and the collateral order doctrine. I also believe that such is necessary in the interests of national security, as has been represented to us on behalf of the President of the United States.
 
 
 40
 In my judgment, first the district court, then the panel, and now, regrettably, this court en banc, have all failed to appreciate the fragility of the intelligence gathering process and the susceptibility of that process to influences that might be thought remote and inconsequential in other contexts. Because of this failure, I believe my colleagues have gravely underestimated the effect that their respective orders and decisions have already had, and now will continue to have, on the Nation's intelligence gathering during this critical period of our history, as we wage war against terrorism and its sponsors around the globe.
 
 I.
 
 41
 The issue that has been brought before the court has profound implications for the Nation's security. That this is so, however, does not mean that the government is relieved of its obligations under the Constitution and laws of the United States. Quite the opposite. The government's efforts to ensure security to its citizens, like all other governmental activities, are subject to law (if they are not especially subject to law in this context). However, in this instance, neither the Constitution nor statute requires the risk to our Nation's security that the court, by its decisions, confidently but no less improperly accepts on the public's behalf today.
 
 
 42
 The panel opinion, whose mandate it is asked that we recall and of which en banc reconsideration is sought, is ambiguous. This fact, given the signal importance of the litigation and the corresponding imperative for clarity, itself provides sufficient reason for the full court to rehear this case. But under any of the three arguable readings of the opinion, the court also plainly erred in its conclusion that the district court's order of deposition is not immediately appealable under the Classified Information Procedures Act, and therefore that the national security must yield, at least for the time being, to other interests.
 
 A.
 
 43
 The panel unfortunately does not articulate either its reasoning or its conclusion sufficiently clearly that the parties, the public, or even the members of this court can understand its decision. The analytical ambiguity that inheres in the panel's analysis of CIPA in particular is evident in the single passage of analysis offered for the court's decision. In relevant part, that brief passage states as follows:
 
 
 44
 Here, the Government contends that the order of the district court directing the deposition of the enemy combatant witness is "a decision or order ... authorizing the disclosure of classified information," from which it may take an immediate appeal. We disagree. CIPA § 6, to which the Government points, is concerned with the disclosure of classified information by the defendant to the public at a trial or pretrial proceeding, not the pretrial disclosure of classified information to the defendant or his attorneys. It is true, of course, that the district court issued the testimonial writ based in part on its assessment that the enemy combatant witness' testimony would likely be helpful to Moussaoui's defense. But, neither this conclusion, nor the fact that the purpose of the deposition is to preserve the enemy combatant witness' testimony for potential use at trial, is sufficient to establish the applicability of CIPA. At its core, the order of the district court concerned only the question of whether Moussaoui and standby counsel would be granted access to the enemy combatant witness (and if so, what form of access), not whether any particular statement of this witness would be admitted at trial. The district court was thus correct to conclude that CIPA applies here only by analogy. Because CIPA is not directly applicable, § 7 does not authorize an interlocutory appeal.
 
 
 45
 Slip op. 7-8 (internal citations omitted). This text can be read, and fairly so, in any of three ways. It can be read to hold that the district court order did not "authorize the disclosure of classified information." Or it can be read to hold that, even though the district court order did authorize disclosure of classified information, section 7 of CIPA does not permit an interlocutory appeal from this order because it was not, by its terms, issued under CIPA or under authority of that Act, and therefore CIPA's appellate review provisions do not apply to this court's consideration of the instant appeal. Finally, it can be read to hold that the district court order authorized the disclosure of classified information, but not the particular type of disclosure with which CIPA is concerned.
 
 
 46
 On any of these understandings of the panel's opinion, the court erred in its essential conclusion that an immediate appeal of the district court's order does not lie under CIPA.
 
 B.
 
 47
 Under the first reading of the panel's opinion, the court would have held that the order from which the government appeals does not "authorize the disclosure of classified information," within the meaning of section 7(a) of CIPA. Were this the holding of the court, it would be in error because the district court's order most certainly does authorize the disclosure of classified information. As the government explains, Moussaoui does not have the necessary clearance to receive classified information from the government. Petition for Panel Rehearing or Rehearing En Banc at 3. Therefore, absent the district court's order, the government officials in possession of the classified information Moussaoui seeks would themselves have no authority to produce such classified information to Moussaoui; indeed, the unauthorized disclosure of classified information to an individual, like Moussaoui, who is not cleared to receive such information, would likely constitute a felony under Title 18, section 798, of the United States Code.
 
 
 48
 Thus, the district court's order unquestionably "authorizes the disclosure of classified information" in the government's possession to Moussaoui, an authorization that brings the district court's order squarely within the ambit of the plain language of section 7(a).
 
 
 49
 Under the second possible reading of the panel's opinion, the court would have held that section 7 only permits interlocutory appeal when CIPA is "directly applicable" to the order appealed by the government. See Slip op. 8. The panel does not explain its reference to a precondition of direct applicability. Presumably, however, that reference is to a belief that, in order for section 7 to authorize interlocutory appeal, either the district court's order must have been explicitly entered pursuant to, or at least have been authorized by, a provision of CIPA other than section 7(a). But even if the panel's opinion were read to so hold, the court would yet be in error, because such a holding cannot be squared with CIPA's plain language.
 
 
 50
 Section 7(a) of CIPA provides simply that appellate jurisdiction will lie over "a decision or order of a district court in a criminal case authorizing disclosure of classified information." Section 7(a)'s authorization of immediate appeal is not limited to orders that, by their terms, are entered pursuant to CIPA or even to orders that are authorized by CIPA. (As the government notes, even if such a limitation existed, it would be satisfied here, because the district court's order is a "determination[ ] concerning the use ... of classified information ... [at] ... [a] pretrial proceeding" within the meaning of section 6.). Nor does any other provision of CIPA even arguably impose such a limitation. And had Congress wished to circumscribe section 7(a) so as to provide appellate jurisdiction only over such orders, it could easily have done so. In fact, section 6(c)(1) of CIPA employs precisely this sort of limitation, providing that the United States may move to substitute admissions or a redacted summary in lieu of classified information "[u]pon any determination by the court authorizing the disclosure of specific classified information under the procedures established by this section." Id. (emphasis added).
 
 
 51
 Finally, under the last of the three possible readings of the panel's opinion, the court would have held that section 7(a) of CIPA is unconcerned with the disclosure of classified information by the government to the defendant, and, instead, protects only against the disclosure of such information by the defendant to the "public" (which does not include the defendant and his attorneys) in a pretrial hearing or at trial. That this was the holding most likely intended by the panel is suggested by the first sentence of its CIPA discussion, which asserts that CIPA was enacted "to combat the problem of `graymail,' an attempt by a defendant to derail a criminal trial by threatening to disclose classified information." Slip op. 7. And, indeed, that this is in fact the court's holding is all but confirmed by the statements and conclusions that are featured in the panel's short analysis. Those statements and conclusions are that "CIPA § 6, to which the Government points, is concerned with the disclosure of classified information by the defendant to the public at a trial or pretrial proceeding, not the pretrial disclosure of classified information to the defendant or his attorneys" and that "the order of the district court concerned only the question of whether Moussaoui and standby counsel would be granted access to the enemy combatant witness (and if so, what form of access), not whether any particular statement of this witness would be admitted at trial." Id.
 
 
 52
 It is unsurprising, therefore, that the United States understands the panel's opinion to hold that an immediate appeal of the district court's order does not lie because it authorizes disclosure only to Moussaoui and his attorneys, and not to the public at large. See Petition for Rehearing or Rehearing En Banc at 4 (stating that the panel opinion "held that the particular disclosure of classified information authorized by the order does not trigger Section 7, because it involves only disclosure to the defendant, not disclosure to the public"). Indeed, this is what I understand the panel to have held as well.
 
 
 53
 I agree with the government that the panel held that immediate appeal does not lie under section 7(a) of CIPA where at issue is only an authorized disclosure to the defendant. However, on the assumption that this is the court's holding, it, too, is in error.
 
 
 54
 To be sure, CIPA is concerned with a defendant's disclosure to the public of classified information that is already in the defendant's possession. But this is not the only concern of the statute, and to fail to appreciate that there are also other concerns embodied in the Act is to misunderstand the Act. CIPA is equally concerned with the foreseeable (and foreseen) event that defendants will attempt to delay, if not altogether derail their prosecutions by attempts to obtain access to classified information that they do not already possess. For example, sections 2, 4, and 6 of the Act are all concerned with the production of classified information by the government to the defendant. This additional purpose of the statute has nowhere been more forcefully recognized than in the Ninth Circuit's opinion in United States v. Clegg, 740 F.2d 16 (9th Cir.1984), where the court found it "clear that CIPA is as concerned with controlling disclosures to the defendant as it is with controlling disclosures to the public." Id. at 18.
 
 
 55
 The conclusion that CIPA extends to the circumstance, such as that here, where the defendant seeks access to classified information, is unavoidable based upon the plain language of CIPA. But, in fitting coincidence, even the Senate Report relied upon by the panel for its mistakenly narrower interpretation of the Act confirms as much. That report clearly states that the problems CIPA was meant to address are not "limited to instances of unscrupulous or questionable conduct by defendants since wholly proper defense attempts to obtain or disclose classified information may present the government with the same `disclose or dismiss' dilemma." S.Rep. No. 96-823, at 3 (1980), reprinted in 1980 U.S.Code Cong. & Admin. News 4294, 4296-97 (emphasis added).
 
 
 56
 Accordingly, I believe that, under section 7(a) of CIPA, an immediate appeal of the district court's order of deposition lies to this court.
 
 C.
 
 57
 That an immediate appeal of the district court's order does lie under CIPA, and thus that the panel erred in its contrary conclusion, is only further supported by the fact that our sister circuits have rejected the very analysis the panel adopted — in opinions that are not even cited, much less discussed, by the panel. Refusing to fall into the error committed by our court, the Ninth Circuit held unequivocally in United States v. Clegg, in an opinion joined by then-Judge Kennedy, that section 7(a) of CIPA provides for appellate jurisdiction not merely over court orders authorizing disclosure by the defendant to the public, but also over orders authorizing disclosure by the government to the defendant. See Clegg, 740 F.2d at 18; see also United States v. The LaRouche Campaign, 695 F.Supp. 1282, 1288 (D.Mass.1988) (noting that one "manifest objective of CIPA is that classified information should not be disclosed to anyone needlessly" and that "when classified information is not yet in the hands of defendants and their attorneys and they are making demands for disclosure, the court must consider whether defendant's rights can be fully protected by an alternative procedure that does not result in the disclosure of classified information.") (emphasis added). The District of Columbia Circuit, in United States v. Yunis, 867 F.2d 617 (D.C.Cir.1989), although it was not required to decide the question, even assumed that it had jurisdiction over such an order under section 7(a) of CIPA.
 
 
 58
 Thus, in its indefensible reading of CIPA, our panel stands not only alone, but in direct conflict with our sister circuits that have considered the question.
 
 II.
 
 59
 While I believe that the district court's order is immediately appealable under CIPA, I believe the panel would be mistaken in its conclusion that the district court's order is not immediately appealable even were such an appeal not authorized by that Act, because the district court's order is independently appealable under 28 U.S.C. § 1291, as a collateral order. See United States v. Pappas, 94 F.3d 795, 798 (2d Cir.1996) (holding that "CIPA does not deny appellate jurisdiction that otherwise exists. It simply extends to the Government, but not to the defendant, the opportunity for an interlocutory appeal of protective orders in circumstances where an appeal would not otherwise exist."). Although section 1291 provides that appeal may be taken only from a "final order," the panel correctly recognizes that "[t]he Supreme Court has long given the finality requirement in § 1291 a practical construction rather than a technical one." Slip op. 8 (citing Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). Yet the panel proceeds to apply the finality requirement technically rather than practically, by insisting that the district court's order is a "discovery order like any other" and that it must be "treated the same for jurisdictional purposes." Slip op. 10.
 
 
 60
 If properly applied to take into account the exceptional nature of the order at issue, I have no question but that the district court's order is immediately appealable under the collateral order doctrine, as well as under section 7(a) of CIPA.
 
 
 61
 The panel's rejection of appellate jurisdiction under the collateral order doctrine rests specifically on its holding that the district court order "fails to satisfy the first prong of the Cohen analysis," slip op. 9, which requires that "an order conclusively determine the disputed question." Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). This holding is obviously incorrect. The district court order conclusively resolves the question of the defendant's right to depose the enemy combatant witness, as that court's subsequent actions confirm. The district court affirmed its original order of deposition on March 10, 2003, with a written opinion. It later denied the government's motion to modify the order in a May 15, 2003, ruling, rejecting an affidavit of the government certifying that the disclosure of the information would cause "identifiable damage to the national security." See Petition for Panel Rehearing and Rehearing En Banc at 3 n. 1. And, on July 7, 2003, the court ordered that the United States appear today to advise the court whether it intends to comply with the court's order of deposition. Clearly, the district court's order was not, as the panel erroneously claims, "tentative, informal or incomplete." Cohen, 337 U.S. at 546, 69 S.Ct. 1221.
 
 
 62
 The panel reasoned that the order is "incomplete" until the government openly defies it and incurs sanctions. Slip op. 9. But this cannot be so. An order imposing sanctions would resolve an entirely separate question from the one resolved by the order of deposition. The question of whether Moussaoui has a right to depose the witness is entirely distinct from the question of what sanction will be imposed if the government defies the court order recognizing that right.
 
 
 63
 By effectively holding that a district court discovery order can never satisfy the first prong of Cohen unless sanctions are imposed for disobedience of that order, the panel again disregarded contrary authority from our sister circuits. In In re Ford Motor Co., 110 F.3d 954, 958 (3d Cir.1997), the Third Circuit held that a discovery order requiring the production of disputed documents did satisfy the first prong of Cohen because it left "no room for further consideration by the district court of the claim that the documents are protected." Likewise, in United States v. Philip Morris, Inc., 314 F.3d 612, 617 (D.C.Cir.2003), the District of Columbia Circuit held that a district court order that a particular memorandum was not protected by the attorney-client privilege satisfied the first prong of Cohen because it conclusively and finally determined a distinctly separate issue from the merits of the underlying dispute. In fact, in holding that the order in question was appealable under the collateral order doctrine, the court specifically rejected the contention that a discovery order must be defied and sanctions must be imposed in order for that order to be appealable.
 
 
 64
 Although the panel opinion does not even discuss the second and third prongs of Cohen, it is evident that the district court's order satisfies both of these requirements. As to the second prong, the appeal indisputably presents a matter of great importance — implicating as it does the Nation's security — which is distinct from the merits of the underlying criminal case. The district court's order also satisfies Cohen's third prong, requiring that the order be effectively unreviewable on appeal from final judgment. For, were the government to comply with the district court's order by producing an enemy combatant witness to be deposed by Moussaoui and his lawyers, the harm to the national security would be irreparable. And, if the government chooses to defy the district court's order and accept the likely sanction, the harm inflicted could be significant even if the sanction were ultimately reversed by this court on subsequent appeal. See discussion infra.
 
 
 65
 At bottom, the panel's insistence that the United States first be sanctioned before appealing the district court's order of deposition is premised on its fundamentally flawed belief that that order is "a discovery order like any other," which "must be treated the same for jurisdictional purposes." Slip op. 10. The district court's order simply is not a discovery order like any other. It is, rather, a unique order, perhaps even unprecedented in our jurisprudence.
 
 
 66
 When such an extraordinary order with such far-reaching effects is appealed, it is plain error to treat it the same as a run-of-the-mill discovery order. As the Supreme Court instructed in United States v. Nixon, 418 U.S. 683, 691, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) — an opinion which the panel nonchalantly distinguishes with a citation to Bennett v. City of Boston, 54 F.3d 18 (1st Cir.1995), a case involving an interlocutory appeal by a district attorney in a routine criminal prosecution, see slip op. 10 n. 8 — "[t]he requirement of submitting to contempt [ ] is not without exception and in some instances the purposes underlying the finality rule require a different result."
 
 
 67
 The instant case comfortably falls within the category of exceptional cases envisioned by the Court in Nixon as warranting interlocutory appeal.
 
 
 68
 Many of the factors present in the "unique setting" of Nixon are also present in this case. As in Nixon, the requirement that the United States place itself "in the posture of disobeying an order of a court merely to trigger the procedural mechanism for review of the ruling would be unseemly and would present an unnecessary occasion for constitutional confrontation between two branches of Government." Id. at 691-92, 94 S.Ct. 3090. If anything, this consideration weighs even more heavily in this case than it did in Nixon because the district court's order impedes the President's exercise of power as Commander-in-Chief by limiting his authority to prevent access by and to enemy combatants. And, as in Nixon, the requirement that the United States first be sanctioned by the district court before appealing its underlying claim to this court only "would further delay both review on the merits of [its] claim ... and the ultimate termination of the underlying criminal action for which [its] evidence is sought."
 
 
 69
 In sum, the required balance under the collateral order doctrine manifestly ought be struck in favor of immediate appealability in this case, and I would so hold.
 
 III.
 
 70
 I have no doubt whatever that the several orders and decisions issued by the district court and the panel have already not merely caused alteration of, but actually disrupted, the questioning of the particular enemy combatant witness whose production and deposition have been ordered by the district court. The timetables carefully laid out for, and the techniques designed specifically to be employed in, the questioning of this witness have inevitably had to be adjusted both in anticipation of the predicted rulings that would issue from this court and the district court and in response to the actual rulings that have come forth from these courts. Just as certainly, in detriment to the strategic interests of the Country, the government has also been required to artificially structure its questioning of this enemy combatant witness around the real possibility that any information imparted to him in order to obtain information in his possession may ultimately have to be disclosed to the defendant and his counsel during the course of judicially-ordered deposition, if not to the public at large at any ensuing trial. And common sense should tell that our orders and decisions have, as well, exacted untold hidden costs with respect to other existing and potential informants who have, respectively, either withheld information that they would otherwise have already provided or decided not to come forward at all until this litigation is finally resolved and its implications for their considered disclosures fully understood.
 
 
 71
 Of course, none of this is even to mention the obvious fact that, in their efforts to protect the Nation, the President and his national security advisors, if only incrementally so, have had to proceed differently than they might otherwise have proceeded were this particular matter not hanging over them like the sword of Damocles, as they have awaited final decision from us.
 
 
 72
 The panel, and now the full court, have comforted themselves in the fact that we will eventually have jurisdiction to review any order of the district court sanctioning the United States for noncompliance with its extraordinary order of deposition. This is, there should be no doubt, to ignore (or to accept without full appreciation of the possible costs to national security) the distinct possibility that, because of the courts' actions, appellate review of any sanction imposed will never be sought, with attendant consequences for the President's diplomatic and military conduct of the war against terrorism left to be borne by an unsuspecting public.
 
 
 73
 In any event, in taking comfort in the belief that appellate review will ultimately be had, the court only fails again to appreciate the profound effect that any decision in a litigation of this sensitivity inescapably has upon the delicate psychological balance that can determine victory or defeat as much as can combat itself. For even the temporary imposition of sanction in a case of this delicacy and significance to the war against terrorism can, at the very moment when psychological advantage could prove determinative of the conflict or its direction, embolden the enemy in that war and weaken the resolve of those who are charged with prosecution of that war and with protection of our homeland. One can only imagine the encouragement that even a short-lived order dismissing the charges against the appellee in this case would provide the terrorist network and its allies around the world, and the demoralizing setback that such would in turn represent for the men and women who have been charged to track down, capture, and bring to justice those who have brought fear to the international stage. Such an order would resonate throughout the world, and, its belief to the contrary notwithstanding, this court simply could not calibrate its actions finely enough or react swiftly enough to prevent such a sanction from having unanticipated deleterious effect on the Nation's security.
 
 IV.
 
 74
 The panel opinion of which further review has been sought rested squarely, as the court openly stated, on a conclusion that the "order of the district court is a discovery order like any other." The district court's order, however, is not like any discovery order, and, as the government suggests, it may in fact be un like any other discovery order. The district court's order of deposition, whether right or wrong under law, was extra-ordinary in every sense, affecting, as the government compellingly explains, "an ongoing military operation by demanding the disruption of efforts to obtain intelligence and providing an admitted terrorist with access to an enemy combatant detained overseas in the midst of war," see Petition for Panel Rehearing or Rehearing En Banc at 14.
 
 
 75
 Because I believe that, under law, the United States is entitled to immediate review of this extraordinary order entered by the district court, I would grant the motion of the United States to recall the mandate issued by the panel, grant the petition for rehearing en banc, and hold that interlocutory appeal lies in this court to hear, on the merits, the government's appeal of the district court's order of deposition. To proceed differently, as the court does today, is to play Russian roulette with the security of the Nation.
 
 
 76
 For these reasons, I dissent.